IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

MELINDA GAYE KEY                    )
                                    )
v.                                  )        No. 2:10-0092
                                    )        Judge Wiseman/Bryant
SOCIAL SECURITY ADMINISTRATION      )


To:     The Honorable Thomas A. Wiseman, Jr., Senior Judge


## REPORT AND RECOMMENDATION

        This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c), to

obtain judicial review of the final decision of the Social Security Administration ("SSA" or

"the Administration"), through its Commissioner, denying plaintiff's application for

disability insurance benefits ("DIB") and supplemental security income ("SSI"), as provided

under the Social Security Act.  The case is currently pending on plaintiff's motion for

judgment on the administrative record (Docket Entry No. 15), to which defendant has

responded (Docket Entry No. 23).  Upon consideration of these papers and the transcript of

the administrative record (see Docket Entry No. 13),[1] and for the reasons given below, the

undersigned recommends that plaintiff's motion for judgment be GRANTED, and that the

decision of the SSA be REVERSED and the cause REMANDED for further administrative

proceedings consistent with this report.

_____

        [1]Referenced hereinafter by page number(s) following the abbreviation "Tr."

## I.  Introduction

Plaintiff filed her DIB and SSI applications on August 2, 2005, alleging disability onset as of January 1, 1988, due to a host of medical conditions.  (Tr. 61, 73-75, 142)  These applications were denied upon initial agency review, and again on reconsideration.  Plaintiff thereafter appealed to the Administrative Law Judge ("ALJ") level, and her case was heard on August 6, 2008.  (Tr. 831-54)  Plaintiff was represented by counsel at the hearing, and testified upon examination by counsel and the ALJ.  At the conclusion of the hearing, the ALJ took the matter under advisement, until October 28, 2008, when she issued a written decision denying plaintiff's claims to benefits.  (Tr. 15-23)  That decision contains the following enumerated findings:

1.  The claimant met the insured status requirements of the Social Security Act through March 31, 1993.

2.  The claimant has not engaged in substantial gainful activity since July 1, 1988, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  The claimant has the following severe combination of impairments: osteoarthritis, obesity, and tobacco abuse (20 CFR 404.1521 *et seq.* and 416.921 *et seq.*).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b).

6.  The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on April 16, 1962 and was 26 years old, which is defined as a "younger individual," on the alleged disability onset date (20 CFR

404.1563 and 416.963).

8.  The claimant has a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from July 1, 1988 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 17, 19, 22-23)

On August 4, 2010, the Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 3-6), thereby rendering that decision the final decision of the Administration. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. §§ 405(g), 1383(c)(3). If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive. Id

## II.  Review of the Record

To begin with, it appears that plaintiff now concedes the validity of the SSA's decision on her claim for disability insurance benefits under Title II of the Social Security Act. The arguments in her brief do not consider any evidence from her insured period, which expired in 1993, and she concludes her brief by urging the reversal of "the Commissioner's decision as it applies to Title XVI benefits." (Docket Entry No. 18 at 20)

Plaintiff's thorough summary of the lengthy medical and testimonial record (id. at 2-18) is repeated verbatim below.

## Medical evidence

After reporting symptoms of lower extremity weakness and unrelenting lactation, a pituitary adenoma was discovered and transphenoidal pituitary hypophysectomy surgery was performed in July of 1997. (Tr. 796-799). On December 10, 1997, Dr. George S. Allen saw Ms. Key in follow up after surgery. Dr. Allen reported that Ms. Key continued to have headaches but overall was doing well. Repeat MRI in one year was suggested. (Tr. 794). On September 15, 1998, Dr. H. David Hall evaluated Ms. Key for right sided headaches which had occurred for 2 years classified as level 10 on the pain scale. Dr. Hall found Ms. Key to have right sided internal derangement of the temporomandibular joint with pain and non-painful internal derangement of the left temporomandibular joint. Dr. Hall recommended a week trial of a non-chewing diet and Elavil for sleep. (Tr. 791-792).

Ms. Key returned to Dr. Hall and notes from October 29, 2008, show Ms. Key one day postop a right modified condylotmomy. (Tr. 790).

Seven weeks after the right temporomandibular joint surgery, Ms. Key returned to Dr. Hall pain free on the right but with significant pain on the left. Dr. Hall believed it to be appropriate to perform left sided surgery. (Tr. 787). Surgery was performed on January 6, 1999. (Tr. 786). Three months after the surgery, Dr. Hall noted on April 6, 1999, that Ms. Key had a good post-operative course with no pain on the right and only occasional pain on the left. (Tr. 784).

On August 6, 1999, a CT of the chest was normal with a solitary 5mm probably non-

calcified nodular density in the left lower lobe. (Tr. 435-436). (Tr. 437).

On December 16, 1999, Ms. Key was evaluated by Dr. Bonnie Slovis for dyspnea and hoarseness. (Tr. 781). Ms. Key complained of headache. Dr. Slovis referred Ms. Key to Dr. Gaelyn Garrett for evaluation of laryngeal dysfunction, Dr. Michael May for management of her pituitary insufficiency and ordered a follow up CT scan for the pulmonary nodule. (Tr. 782-783).

On January 5, 2000, Ms. Key was seen by Dr. Michael E. May at the Vanderbilt Center for Endocrine and Diabetes Care. Medications included Valium and Phenergan as needed and herbal diet pills. Diabetes insipidus was ruled out. (Tr. 341).

From September 1999 through January 26, 2000, Ms. Key had chronic hoarseness that required IV antibiotics and aggressive therapy. She recovered but continued to have significant voice problems. The chronic hoarseness was attributed to smoking and reflux. She was advised to quit smoking and placed on Tagamet by Dr. C. Gaelyn Garrett at Vanderbilt. (Tr. 779-780).

On June 8, 2000, Ms. Key underwent diagnostic laparoscopy and total hysterectomy, with anterior repair at University/McFarland Hospital for menorrhagia, uterine fibroids, pelvic relaxation, cystocele, and stress urinary incontinence. (Tr. 430-434).

On September 5, 2001, Dr. Bob Herring noted that Ms. Key had apparent hepatitis C with chronic diarrhea and abdominal pain which she had had for approximately one year. She was to return for a liver biopsy. (Tr. 372). Dr. Herring noted in his letter of September 5, 2001 that Ms. Key did not have Hepatitis C. (Tr. 372). On September 13, 2001, a colonoscopy was performed revealing probable irritable bowel syndrome. (Tr. 388-389).

On February 19, 2002, Ms. Key was treated at Cookeville Regional Medical Center for

dizziness and a rash. (Tr. 643). She returned in April 2002 for epigastric pain. She was treated with a GI cocktail for nausea, vomiting and diarrhea. (Tr. 641).

On May 3, 2002, Dr. Herring performed an EGD which revealed reflux esophagitis. Prevacid 30mg daily was prescribed. (Tr. 566-567).

In June 2002, she returned to Cookeville Regional Medical Center for back pain, neck pain and right ankle pain after falling and twisting her ankle. (Tr. 639).

In September 2002, Dr. Burton-Shannon wrote Ms. Key's attorney, John Phillip Parsons, that Ms. Key had recently developed uncontrolled hypertension resulting in an acute exacerbation of chronic headaches that had been controlled for a long period of time. She was under the care of a cardiologist and neurologist for these as well as unexplained blackouts. She had been under the care of a Gastroenterologist for Hepatitis C. She was diagnosed with carpal tunnel syndrome; surgery was suggested, but she was not willing to take the risk. Throughout her separation and with the development of other medical problems, she had developed nervous tension and anxiety and she was taking medication for this as well. (Tr. 518).

In October 2002, psychiatric notes taken on admission to Smith County Memorial Hospital reveal Ms. Key was suffering from syncope and chest pain with panic exacerbation, hyperventilation, and back pain. She experienced two episodes of syncope three minutes in duration each. Depression, anxiety and panic were noted in her history. She was discharged in stable condition. (Tr. 195).

An echocardiogram obtained on October 4, 2002 revealed no evidence of significant valvular abnormalities and no evidence of pulmonary hypertension. (Tr. 564).

On November 6, 2002, Ms. Key returned to Dr. Kathleen Kearney stating she had a

syncopal episode. She said she had three black out spells within minutes of each other which her friend treated with cold rags. Dr. Kearney referred Ms. Key to an electro physiologist because of the difficulty obtaining a monitored episode. Altace was increased due to elevated blood pressure. A cuff was prescribed and she was to keep a blood pressure log. Dr. Kearney noted that Ms. Key was still having issues with her monitor and they were trying to work out the issues. Her blood pressure was 135/100 in the right and 140/98 in the left. (Tr. 513-514).

On November 20, 2002, a Kidner procedure with reattachment of the posterior tibial tendon using Mitek anchor of the left foot was performed at Southern Hills Medical Center. Ms. Key was diagnosed with fractured accessory navicular left foot with posterior tibial tendinitis. (Tr. 258-263).

In January 2003, Ms. Key went to Southern Hills Medical Center for a surgical correction of the previous Kidner procedure on her left foot. She was diagnosed with tibial tendinitis, anomalies of the foot, and contusion of the foot. A Kidner procedure with removal of Mitek anchor of the left foot was performed for posterior tibial tendonitis with accessory navicular and contusion and injury status post Kidner procedure performed two months earlier with her injury being one week old. (Tr. 280-286).

On March 25, 2003, Dr. Clarinda Burton-Shannon referred Ms. Key to Dr. Sivalingam Kanagasegar for evaluation of pain over both TM joints for several years. She had operation at Vanderbilt on both sides three to four years earlier and was only 50% better. She had a chronic headache and a pituitary tumor was operated on five years earlier which relieved the headache. Six days earlier she had been hit by a car at the rear end. She had pain around the left ankle and the left side of the chest. X-rays were negative. She was having pain over the

lumbar region as well as the lower thoracic spine area. The pain radiated across the back and started two days after the accident. She was diagnosed with TMJ arthritis, probable sprain over the lumbar and thoracic area, and osteoporosis. Sulfindac 150 mg twice per day and Lortab 5/500 were prescribed and Soma was renewed to help relax the muscle. She was advised to take calcium and vitamin D as well. (Tr. 510-512).

On May 13, 2003, Ms. Key returned to Dr. Kanagasegar for follow-up evaluation. She had an injury to the left ankle that had been through two surgeries and had not healed. She was receiving care at the Wound Care Center. She was taking Hydrocodone at night with good response. She had intermittent pain over the lower back and sometimes over the thoracic spine that started after her accident as well as swelling of the left foot. She rated her pain a 7 of 10. She was assessed with TMJ, arthritis, pain over the lumbar spine and thoracic spine which was probably a sprain, and pain around the left ankle. She was given Lortab 5/500 with one refill and advised to continue Soma. Fosamax, Calcium, and Vitamin D were recommended if a DEXA scan showed osteoporosis. (Tr. 508).

On June 10, 2003, Ms. Key returned to Dr. Bob Herring complaining of diarrhea four to five times daily with a working diagnosis of irritable bowel syndrome. She was given bran tablets to help with stool consistency and Anaspaz for cramping. (Tr. 506).

On July 14, 2003, Dr. Herring noted that she rescheduled her EGD due to a family death. She had slight elevation of her alkaline phosphatase which Dr. Herring stated was due to bone disease. He deferred work-up to Dr. Burton-Shannon. Her white count was slightly elevated at 11,700 and hemoglobin slightly elevated at 15.6. (Tr. 368).

An EGD was performed by Dr. Herring on July 28, 2003 revealing reflux refractory to a combination of Prevacid and metcloplamide as well as gastritis. A manometry was ordered

and she was instructed to avoid NSAIDs. (Tr. 384-386). A stomach biopsy revealed chronic superficial gastritis while a small bowel biopsy was normal. (Tr. 392).

On June 7, 2003, Ms. Key went to Cookeville Regional Medical Center for a foot injury due to a fall. She was diagnosed with left ankle sprain. She returned on August 10, 2003 with left foot pain (Tr. 615-619).

On August 19, 2003, records from Ms. Key's cardiologist show that she was taking Altace 10 mg. one time per day, Lasix 20 mg one time per day, Atenolol 50 mg one time per day, Carisoprodol 350 mg one time per day, Cimetidine 400 mg one time per day, Alprazolam 4 mg three times per day, Naproxen 550 mg as needed, Hydrocodone/APAP 7.5/500 mg twice per day, Promethazine 25 mg as needed, Cyst Cal with D 500 mg one time per day, and Lisinopril 20 mg two times per day. (Tr. 456).

On September 14, 2003, Ms. Key fell sustaining an injury to her left wrist and thumb area. She was seen in the hospital where a thumb splint was applied. (Tr. 613-615). On September 15, 2003, x-ray exam of the left wrist revealed a probable benign appearing bone cyst distal radius and ulna. (Tr. 193). She was referred to Dr. Matloob Khan for further treatment. Range of motion was very painful and the wrist and thumb were very tender on exam. She was treated for a sprain and a short arm cast was applied. (Tr. 504).

On November 10, 2003, Ms. Key went to Dr. Paul Abbey at Tennessee Orthopedics after a fall onto a deck in September of 2003. She had osteoporosis and trouble picking things up due to pain. She was placed in a protective splint. (Tr. 586).

In February 2004, Ms. Key was seen at Southern Hills Medical Center for left foot pain status post op I & D of chronic ulcer. She received Demerol and Phenergan and a written prescription for Lortab. (Tr. 289-296). She returned in March 2004 with pain on the

bottom of the foot. X-ray revealed degenerative changes at the first metatarsophalangeal joint. It was felt that she might have recurrence of infection. She received Levaquin, Demerol and Phenergan in the emergency room. (Tr. 297-303).

A letter was submitted by Dr. Burton-Shannon to the Department of Human Services in February 2004 summarizing Ms. Key's treatment provided by her since 1997. At that time, her primary care physician stopped taking TennCare and Dr. Burton-Shannon took over her care. She noted Ms. Key had a tumor in her head which had been checked annually by CT scan and there had been no evidence of a reoccurrence for the last four years. In 2001, colonoscopy revealed a hyperplastic polyp. (Tr. 501). She was treated for temporomandibular joint syndrome surgically, and hypertension medicinally. She had been under the care of an orthopedic surgeon for a fractured ankle and damage to the foot as a complication to osteoporosis. She was seeing a gastroenterologist for hepatitis C. Because of logistics, she was inconsistent with her appointments. It was determined that her headaches were stress related and other than stress related to her divorce. To complicate things further, she had developed Adult Onset Type II diabetes, thyroid dysfunction, progressive degenerative osteoarthritis, and worsening of her chronic bronchitis into asthmatic bronchitis. Dr. Burton-Shannon stated that she had no psychological or emotional problems that would keep her from being able to work eventually. She would need to be released from her orthopedic surgeon to be able to return to work. (Tr. 502-503).

In February 2004, Ms. Key returned to Southern Hills Medical Center because of increased pain in her left ankle. She had had multiple complications including osteomyelitis in her left foot. (Tr. 295).

On February 12, 2004, Dr. Herring scheduled her for a manometry to see if she was a

10

candidate for possible fundoplication. Metoclopramide was added in the interim to see if she could get relief. She also complained of cramping abdominal pain associated with multiple diarrhea stools daily. (Tr. 501).

On February 23, 2004, Ms. Key went for a consult with Dr. Kanagasegar. She rated her pain an eight of ten. She had significant oozing for her wound. Dr. Kanagasegar diagnosed Ms. Key with osteoporosis, pain around the left ankle and foot, and advised her to follow up with a podiatrist. (Tr. 500).

On March 2, 2004, Ms. Key returned to Southern Hills Medical Center with increased pain. Recurrence of infection was suspected and Ms. Key was placed on Levaquin 500 mg for 5 days. She was also given a shot of Demerol. (Tr. 302).

On March 5, 2004, Ms. Key returned to Cookeville Regional Medical Center for pain and wound drainage. She was diagnosed with a post-surgical wound infection of the foot and given a Medrol Dose Pak. (Tr. 610-612).

On April 23, 2004, Ms. Key went for a neurology consult due to pain and burning at the sides and bottom of the left foot. She also had back pain and at the left leg with associated numbness and tingling and left foot stiffness with limited flexion of the ankles and toes. She also had chronic migraines and a five year history of carpal tunnel syndrome with worsening numbness and hand pain that was waking her up at night. The impression was tarsal tunnel syndrome in the left foot versus reflex sympathetic dystrophy; carpal tunnel syndrome, status post transphenoidal hypophysectomy for pituitary macroadenenoma; low back pain versus lumbosacral radiculopathy; and atypical migraine. Dr. Maria Delores Jumao-as Salibay recommended an EMG. She prescribed Elavil and Topamax and recommended physical therapy. (Tr. 472-474).

On May 2, 2004, Ms. Key went to Cookeville Regional Medical Center for mid back pain caused from a fall. She was diagnosed with lumbar strain. (Tr. 607-609).

In May 2004, a bone density study revealed a lumbar spine consistent with osteopenia. (Tr. 191).

On July 29, 2004, Ms. Key went to Cookeville Regional Medical Center for leg pain. She was diagnosed with RSD. (Tr. 604-606).

On August 4, 2004, she went to Dr. Tracy Merrell in excruciating pain stating Dr.Burton-Shannon was out of town. Her foot, toes, legs and hip hurt and she could not sit still in the office. She had some swelling and skin color change on the bottom of her foot and swelling on her ankle. She was having hypersensitivity to the point that it was painful to her. Dr. Merrell encouraged her to follow up with Dr. Burton-Shannon and be referred to a pain clinic and a possible specialist for treatment of RSD as well as an acupuncturist. She was given a prescription for Percocet 5mg and advised to return as needed. She returned to Dr. Merrell on October 12, 2004. She had been to her doctor in Carthage who had not suggested acupuncture for her RSD after she brought it up and she had questions about it. She agreed to go ahead with it regardless after Dr. Merrell explained that several people had improved with the treatment. She appeared to be in a lot of pain and discomfort and was given Percocet 5mg every 4 to 6 hours for pain. Pain management would be a possibility if her pain continued. (Tr. 588).

She returned to Dr. Merrell on December 8, 2004 with swelling in her foot and problems moving her toes. She had not been to an acupuncturist. She requested pain medication and received Lortab 10mg. She was advised that she would need to continue with pain management if she was to continue this course. (Tr. 588).

12

In November 2004, she was treated at Cookeville Regional Medical Center for difficulty breathing. She was diagnosed with an acute exacerbation of COPD. (Tr. 601-603).

On March 23, 2005, Dr. Michael Moore performed an electrodiagnostic consultation for Dr. Roy Terry. Dr. Moore opined that the abnormal electrodiagnostic studies indicated incomplete peroneal neuropathy at or just distal to the fibular head. The pattern of abnormality suggested a chronic rather than an acute process. Also studies suggested an incomplete neuropathy involving the left medical and lateral plantar nerves. There was evidence of both sensorial and motor axonal involvement. (Tr. 582-583).

X-rays of the right ankle in April 2005 showed lateral soft tissue swelling and mild degenerative change. She was diagnosed with second degree ankle sprain. (Tr. 179-180).

In April 2005, a letter from Dr. Clarinda Burton-Shannon noted that when Ms. Key first came to see her she was following up from a diagnosis at Vanderbilt of diabetes insipidus and follow up of surgery from a small tumor. Over time, she developed Hepatitis C and osteoporosis. As a complication of the osteoporosis she developed a stress fracture in her left foot and subsequently was diagnosed with RSD which results in gradual nerve damage. To complicate things, she developed Adult Onset Diabetes Mellitus, thyroid dysfunction, progressive degenerative osteoarthritis, and worsening of her chronic bronchitis into asthmatic bronchitis. As a result of her physical health declining out of control, as well as a failing marriage, she developed depression requiring medication. Dr. Burton-Shannon asserted that it was "very doubtful that this patient will be able to hold a job for any length of time." Her physical health causes her to be extremely limited in what she can do. Her ability to be a reliable employee is highly unlikely because of the risk of acute flare-ups requiring probably hospitalizations and missing time from work. (Tr. 491).

On February 17, 2006, an x-ray of the right hand revealed mild degenerative changes base of the right thumb at the metacarpophalangeal joint. The right hand was otherwise normal. (Tr. 510). X-ray of the lumbar spine was normal. (Tr. 486, 509).

On February 21, 2006, Ms. Key went to Smith County Memorial Hospital. She complained of chronic migraines every one to two days. She was also experiencing chronic anxiety and increased insomnia that had been present for six years. Her blood pressure was elevated. She was diagnosed with an acute migraine and anxiety and was advised to follow up with her primary care physician in the morning. (Tr. 174).

MRI of the lumbar spine on February 23, 2006, showed sacralization of L5 and mild degenerative changes L3-4 and L4-5 with no evidence of disc herniation or spinal stenosis. (Tr. 479).

On February 24, 2006, Ms. Key was treated by Dr. Kathleen Kearney. Her blood pressures were fairly well controlled at 122/94 and 138/100. She said this was related to her anxiety, stress and pain level. She requested prescriptions for pain medications and angiolytics which Dr. Kearney refused to do. Instead, she stopped Altace and started Lisinopril 20mg twice daily. (Tr. 454-455).

On March 1, 2006, she returned to Dr. Bob Herring, gastroenterologist, for pyrosis, reflux and dysphagia. She was on Cimetidine, the only medication TennCare would pay for. She was given Diazepam and Dicyclomine for suspected irritable bowel syndrome and an EGD were scheduled. (Tr. 468).

On March 12, 2006, x-rays of her left ankle showed mild degenerative spurring and mild degenerative changes. (Tr. 172).

A consultative examination was performed by Dr. Surber on March 31, 2006. Ms. Key

gave a history of pituitary adenoma surgery in 1998 with no subsequent chemotherapy or radiation. Morbid obesity, gastroesophageal reflux disease with hiatal hernia and irritable bowel syndrome, history of post-operative pituitary adenoma, hypertension, diabetes mellitus, depression, anxiety with panic attacks, and pain, all worse in cold or rainy weather were assessed. The examiner averred that Ms. Key would be able to lift or carry 10-25 pounds occasionally, stand or walk with normal breaks for up to 2-4 hours, and sit with normal breaks for up to 6-8 hours of an eight hour workday (Tr. 461-465).

An x-ray of the left ankle dated March 12, 2006 revealed mild degenerative changes. (Tr. 172).

On March 13, 2006, Dr. James N. Moore completed a physical residual functional capacity assessment. He found Ms. Key had the following residual functional capacity: occasionally lift and/or carry: twenty (20) pounds; frequently lift and/or carry: ten (10) pounds; stand or walk: about six (6) hours in an 8-hour workday; and sit about six (6) hours in an 8-hour workday. (Tr. 442-449).

On April 7, 2006, Ms. Key returned to Dr. Salibay complaining of bilateral upper extremity arm pain, left upper extremity numbness in the 3rd through 5th digits, left lower extremity tingling, and some mid back pains. She complained that she was unable to sleep due to pain. A nerve conduction study was normal with no evidence of tarsal tunnel syndrome. (Tr. 249-252).

An EGD was performed on July 27, 2006. Results revealed reflux esophagitis. She continued to have left upper quadrant abdominal pain and nausea on Ranitidine. She had a history of cholelithiasis with cholecystitis and she was status post cholecystectomy. An MRI with MRCP was ordered for further evaluation of her pain which was normal. She received

metoclopramide for symptomatic relief and she was switched to Prevacid. (Tr. 382-383).

On August 24, 2006, a brain scan was performed with findings consistent with previously treated pituitary tumor, the remnants of which were likely present in the low left portion of the pituitary fossa. The brain scan was otherwise normal. (Tr. 251).

On August 24, 2006, Dr. Herring reported that Ms. Key continued to complain of abdominal pain and vomiting that had decreased with the addition of Reglan. Delayed gastric emptying was a consideration and Reglan was increased. A nuclear emptying solid gastric emptying study was ordered. (Tr. 364).

A CT of the facial sinuses dated September 29, 2006 revealed mucosal thickening in the floors of both maxillary sinuses and a 4mm perforation of the nasal septum posteriorly. (Tr. 322).

On October 2, 2006, Dr. Clarinda Burton-Shannon wrote a letter concerning Ms. Key's history. When Ms. Key began treatment with Dr. Burton-Shannon, she had already been diagnosed with Diabetes Mellitus and was still undergoing treatment but at that time needed a primary care physician to order lab work close to home.  She then developed TMJ syndrome that required referral to a maxillofacial specialist. This was able to be treated with medication and a corrective apparatus. She then began having marital issues that resulted in divorce. An evaluation for STD's because of infidelity revealed that she had contracted Hepatitis C allegedly from her spouse. She was under continued care of a Gastroenterologist for this. She fell and broke her ankle while not doing anything strenuous. This raised suspicions. A bone density revealed that she had osteoporosis. She had to have surgery on the affected foot which did not heal well. At that time, she was tested for and diagnosed with Type II diabetes for which she takes oral medication. She has had several other problems

associated with her musculoskeletal system for which she sees an Orthopedic Surgeon as well as a Rheumatologist. She also developed hypertension and is on medication for this. Dr. Burton-Shannon stated that all that she had been through both medically, personally and psychologically resulted in a significant amount of stress. She was placed on antianxiolytic medication to help her function and do what she needs to get done and cope with all the stress in her life. (Tr. 345).

On October 18, 2006, an x-ray of the right ankle at Smith County Memorial Hospital was negative. Ms. Key was diagnosed with left ankle sprain. (Tr. 169-171). On October 19, 2006, an x-ray of the right ankle was normal. (Tr. 480).

On November 16, 2006, she went to Dr. Kathleen Kearney for chest pain radiating into her left arm and shoulder accompanied by shortness of breath, occasional nausea and diaphoresis. The pain was occurring at rest, but she had felt more fatigued over the past two weeks. An ADI and echocardiogram were scheduled and she agreed to stop smoking. Chantix was prescribed for smoking cessation. (Tr. 210, 481).

On January 4, 2007, an adenosine myocardial perfusion stress test was performed at Mid-South Cardiology Associates. The EKG was negative for ischemia. Junctional rhythm, bradycardia with adenosine was resolving in recovery. Gated stress images showed preserved LVEF equaled 70%. It was found that it was probably a normal adenosine sestambi study with breast attenuation artifact. There was not strong evidence for active ischemia. (Tr. 215-219). Echocardiogram indicated some mild pulmonary hypertension. (Tr. 224-225).

On June 19, 2007, Ms. Key went to Riverview Regional Medical Center after being in a motor vehicle accident. She was diagnosed with neck sprain and strain after a negative CT of the cervical spine and negative CT of the head. (Tr. 164-166).

On September 19, 2007, Ms. Key was seen at Cookeville Regional Medical Center after her motor vehicle accident. X-ray of the lumbar spine revealed slight L4-L5 disc space narrowing. She received Flexeril and Percocet for back pain. (Tr. 306-312).

On December 12, 2007, x-ray views of the right knee revealed osteoarthritis and mild degenerative changes. (Tr. 339).

On January 17, 2008, Dr. Herring noted that she had pyrosis with reflux and dysphagia. She was scheduled for an EGD with dilation. (Tr. 234). On January 23, 2008, she rescheduled her EGD to January 31, 2008. (Tr. 201-204). On January 31, 2008, Dr. Robert Herring switched Ms. Key from Prevacid 30mg daily to Nexium 40mg twice daily. She was having left costal pain that Dr. Herring felt was musculoskeletal. He prescribed Naprosyn as well. (Tr. 202). She was to return for colonoscopy because she had a colon polyp removed in 2001. (Tr. 201).

Dr. Burton-Shannon completed a Medical Source Statement of Ability to do Work-Related Activities dated July 18, 2008 indicated Ms. Key could occasionally lift less than ten pounds, stand and/or walk for less than two hours, and sit without restriction. She would be limited in her ability to reach in all directions, handle, finger, and push or pull with her lower extremities. Her pain would often interfere with her ability to maintain attention and concentration and she would need to take unscheduled breaks hourly. She would average more than four absences a month due to her medical condition and/or treatment. She could occasionally kneel and crouch, but never climb, balance, and crawl. She should avoid concentrated exposure to temperature extremes and vibration, moderate exposure to dust, humidity/wetness, and perfumes, and all exposure to hazards, fumes, odors, dusts, gases, solvents/cleaners, soldering fluxes, cigarette smoke, and chemicals. (Tr. 326-330).

Ms. Key testified that she is 5'7" and weighs 203. (TR. 834). She testified that her migraine headaches and pain in her left ankle, leg and foot keep her from working. (Tr. 836-837). Her migraine headaches started prior to a diagnosis of a brain tumor that was removed in 1997. (Tr. 837). She takes medication for the headaches and had TMJ surgery. (Tr. 838). She stated she has blurred vision because of the tumor, but her doctors have said her vision is "good." She has a drivers' license with no restrictions. (Tr. 839). She testified that she had been taking pills for her diabetes for four to five years. (Tr. 839). She also testified that she has pain under her left rib cage, but her doctors had not made a diagnosis. (Tr. 839-840). She testified that she had no side effects from her medications. She has "a little headache nearly daily" and at least one bad headache weekly, lasting anywhere from two to five days at a time. (Tr. 840). She goes in a dark room to help with the headaches. (Tr. 841). She stays at home most of the time, sits on the couch, and tries to stay calm. She was living with her 16 year old son at the time of the hearing. She testified that she has no hobbies. (Tr. 841). Ms. Key testified she had trouble with the headaches and vision when her 16 year old son was an infant. (Tr. 842). During that time, her family members helped her with household chores. (Tr. 843). She has had problems with memory loss and trouble reading and spelling since her surgery. (Tr. 843). She has numbness and tingling in her feet and hands, shooting pains in her feet, and the last time she checked her sugar level it was 408. (Tr. 844). She has had three surgeries on her left foot and now has reflex sympathetic dystrophy. The shooting pains come and go, but she has chronic pain in her hip and leg area. (Tr. 845-846). She has problems with her right hand and doctors want to do surgery, but she does not want to

because she does not heal. After her last foot surgery, it took months for the incision to heal. (Tr. 848). She has to make frequent trips to the bathroom "after eating or drinking a lot of water." (Tr. 848-849). She is able to do light household chores, but she is unable to do outside work. She has problems standing and has poor balance. She can stand 10-15 minutes and holds onto a cart when shopping. (Tr. 849-850). She is uncomfortable sitting because it applies pressure to her left hip and she can't lift because she drops things due to hand numbness. (Tr. 851).

## III. Conclusions of Law

### A. Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007)(quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)). Even if the evidence could also support a different conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached. Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389 (6th Cir. 1999).

### B. Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. at § 423(d)(3). In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

> 1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

> 2) A claimant who does not have a severe impairment will not be found to be disabled.

> 3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.

> 4) A claimant who can perform work that he has done in the past will not be found to be disabled.

> 5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f).

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the

claimant's characteristics identically match the characteristics of the applicable grid rule.  See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003).  Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination.  Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990).  In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony.  See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere.  See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

### C.  Plaintiff's Statement of Errors

Plaintiff seeks reversal of the SSA's decision on the following two grounds:  (1) that the ALJ erred in rejecting the opinion of Dr. Burton-Shannon, plaintiff's long-time treating physician, and (2) that the ALJ erred in discrediting her subjective complaints of disabling pain.  For the reasons that follow, the undersigned finds merit in both arguments.

As to plaintiff's first contention, the medical opinion of a treating source such as Dr. Burton-Shannon is entitled to controlling weight pursuant to 20 C.F.R. § 404.1527(d)(2) if it is well supported by objective, clinical evidence and not substantially

opposed on the record.  Even where such an opinion is not entitled to controlling weight,

the Sixth Circuit has stated that "in all cases there remains a presumption, albeit a rebuttable

one, that the opinion of a treating physician is entitled to great deference. . . ." Rogers v.

Comm'r of Soc. Sec., 486 F.3d 234, 242 (6th Cir. 2007).  Accordingly, ALJs must provide

"good reasons" for discounting the weight of a treating source opinion.  See 20 C.F.R §§

404.1527(d)(2), 416.927(d)(2); Rogers, 486 F.3d at 242.  In this case, the ALJ offered the

following rationale for rejecting the opinions contained in the medical source statements

submitted by Dr. Burton-Shannon:

> The doctor apparently relied quite heavily on the subjective report of
> symptoms and limitations provided by the claimant, and seemed to
> uncritically accept as true most, if not all, of what the claimant reported.  Yet,
> as explained elsewhere in this decision, there exist good reasons for
> questioning the reliability of the claimant's subjective complaints.  The
> possibility always exists that doctors may express an opinion in an effort to
> assist a patient with whom he or she sympathizes for one reason or another.
> Another reality which should be mentioned is that patients can be quite
> insistent and demanding in seeking supportive notes or reports from their
> physicians, who might provide such a note in order to satisfy their patient's
> requests and avoid unnecessary doctor/patient tension.  While it is difficult to
> confirm the presence of such motives, they are more likely in situations where
> the opinion in question departs substantially from the rest of the evidence of
> record, as in the current case.

(Tr. 21)

For purposes of evaluating compliance with the requirement of good reason-

giving, the undersigned declines to consider the speculative language of the last three

sentences above.  See Blakley v. Comm'r of Soc. Sec., 581 F.3d 399, 408 (6th Cir. 2009)

(describing the same, canned language as failing to present any explanation of the weight

given the treating physician's opinion, and thus "fall[ing] short of the Agency's own

procedural requirements: '[A] finding that a treating source medical opinion ... is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected.'" (quoting SSR 96-2p, 1996 WL 374188, at *4)). As to the remaining rationale, notably, the ALJ also rejected the assessment of consultative examiner Dr. Surber on the same grounds: that "his conclusions appear to be based on the claimant's subjective complaints and not objective medical findings." (Tr. 21) As noted by the ALJ, Drs. Burton-Shannon and Surber were the only physicians of record to both examine plaintiff and render a physical functional assessment. (Tr. 21, 326-30, 461-65) While these assessments differ significantly from one another, they are in agreement that plaintiff's impairments significantly limit her ability to stand or walk during an 8-hour workday, though not her ability to sit during that timeframe. Indeed, this limitation on standing and walking appears to be the only material difference between Dr. Surber's assessment and the ALJ's finding of plaintiff's RFC for the full range of light work.[2]

Contrary to the ALJ's finding, plaintiff's limitations related to her left leg, ankle and foot are supported by more than just her subjective complaints and the examining physicians' reliance upon the same. Dr. Surber noted on examination that plaintiff had a

---

[2]Light work is defined as requiring "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. § 416.967(b). The Administration defines "frequent" lifting or carrying as occurring from 1/3 to 2/3 of the workday. (E.g., Tr. 123, 442) Here, Dr. Surber opined that plaintiff could "lift or carry at least 10-25 pounds during up to 1/3 to 1/2 of an 8 hour work day[,] . . . stand or walk with normal breaks for up to 2-4 hours in an 8 hour work day or sit with normal breaks for up to 6-8 hours in an 8 hour work day." (Tr. 465)

limping, antalgic gait towards the left and consistent complaints of pain on weightbearing, though not on palpation or range of motion testing. (Tr. 463-65) In April 2004, plaintiff was diagnosed with tarsal tunnel syndrome in the left foot versus reflex sympathetic dystrophy, after neurological examination findings of reduced motor strength and sensation in the distal left lower extremity. (Tr. 473) In March 2005, consulting orthopedist Dr. Michael P. Moore described plaintiff's history of reported "pain and weakness involving the left distal lower extremity," as follows:

> She dates the onset of her symptoms following a fall approximately 2 years ago, sustaining injuries to her left ankle. She underwent surgical repair for what appears to be a peroneal tendon rupture. She indicates she was in a left lower extremity knee/ankle/foot orthotic or brace for some 2 months after the surgery. She reportedly had a 2nd surgical procedure due to failure of the tendon anchor in January of 2004, as well as surgery to remove some fibrotic "nodules" along the medial aspect of the plantar aspect of her foot. She again was treated following the surgery with approximately an 8-week history of being placed in a knee/ankle/foot orthotic. She has had persistent weakness of the ankle dorsiflexors and toe dorsiflexors, in addition to having burning type pain over the paraincisional area, particularly over the medial aspect of the plantar aspect of the foot, but also has complaints of paresthesias along the dorsum of the foot. She does have complaints of some back pain, has had some referred and sciatic pain radiating to the left lower extremity.

(Tr. 581) Upon examining plaintiff, Dr. Moore noted some tenderness over the fibular head at plaintiff's left knee, surgical scars on plaintiff's left foot, "[d]ysesthesias[3] in the medial plantar distribution, as well as diminished sensation in both the superficial and deep peroneal sensory distribution," and "[m]oderate weakness being 2+ to 3-/5 of the anterolateral

---

[3]"Dysethesia" describes a sensory disturbance whereby normal stimuli produce an abnormal, unpleasant sensation in the affected area. Dorland's Illustrated Medical Dictionary 584 (31st ed. 2007).

compartment musculature" of the lower leg. (Tr. 581-82) After conducting electrodiagnostic studies, Dr. Moore diagnosed incomplete peroneal neuropathy at or just distal to the fibular head, suggesting a chronic rather than acute process in plaintiff's knee, as well as an incomplete neuropathy the left medial and lateral plantar nerves, with evidence of both sensory and motor axonal involvement. (Tr. 582-83) Dr. Burton-Shannon cited this "permanent nerve damage" or "neurologic dystrophy" in support of her opinions that plaintiff could not work, or more particularly that she could not stand/walk or push/pull with her lower extremities for extended periods. (Tr. 326-27, 491) Finally, with such nerve pain and other dysfunction of the left leg and foot on weightbearing maneuvers, plaintiff's morbid obesity would appear worthy of greater consideration than was given by the ALJ. (Tr. 21)

In sum, regardless of the credibility of plaintiff's subjective complaints, the record as a whole contains sufficient objective medical evidence to support the notion that plaintiff is more limited in her ability to stand and walk than the ALJ determined in her RFC finding. At least on this front, the ALJ's explanation that Dr. Burton-Shannon's opinion was rejected because of its overreliance on plaintiff's subjective complaints and inconsistency with the objective medical record does not satisfy the requirement of good reason giving set out in 20 C.F.R. § 416.927(d)(2).

As to the ALJ's finding on the credibility of plaintiff's subjective complaints, she properly invoked the rubric established in, e.g., 20 C.F.R. § 416.929. (Tr. 20-21) Upon finding "a medically determinable impairment(s) that could reasonably be expected to produce [the claimant's] symptoms," the ALJ is required to then evaluate the intensity and

persistence of those symptoms by reference to the record as a whole, including both the objective medical evidence and other evidence bearing on the severity of the claimant's functional limitations.  20 C.F.R. § 416.929(c)(1)-(3).  There is no question that a claimant's subjective complaints can support a finding of disability -- irrespective of the credibility of that claimant's statements before the agency -- if they are grounded in an objectively established, underlying medical condition and are borne out by the medical and other evidence of record.  Id.; see, e.g., Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 531 (6th Cir. 1997); SSR 96-7p, 1996 WL 374186, at *1, 5 (describing the scope of the analysis as including "the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record[;]" "a finding that an individual's statements are not credible, or not wholly credible, is not in itself sufficient to establish that the individual is not disabled.").  Such "other evidence" which the ALJ is bound to consider includes evidence of the following factors:

> (i) Your daily activities;
>
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms;
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
>
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
>
> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

> (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 416.929(c)(3).

Here, after reciting the above standard governing her consideration of plaintiff's credibility, the ALJ found that "the claimant's subjective complaints of disabling physical limitations are disproportionate to the objective clinical and diagnostic medical evidence" (Tr. 21), in the following respects:

> The claimant has required only conservative treatment for migraine headaches in the form of prescribed medications. Her head CT scans and MRI scans have been normal over the last eight years. Her clinical examinations have revealed no significant neurological or motor deficits. Likewise, her treatment for arthritic pain has been entirely conservative in the form of prescribed medications. Despite her allegations, the record does not indicate that the claimant has been definitively diagnosed with rheumatoid arthritis or reflex sympathetic dystrophy. She has not been prescribed physical therapy or assistive devices or been referred to a pain clinic.

(Tr. 20)

Moving on to the regulatory factors addressed to evaluating "other evidence" of plaintiff's limitations, the ALJ offered the following considerations:

> Although the claimant has described daily activities which are fairly limited, two factors weigh against considering these allegations to be strong evidence in favor of finding the claimant disabled. First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty. Secondly, even if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision. Also, a review of the claimant's work history shows minimal work, which raises a question as to whether the claimant's continuing unemployment is actually due to medical impairments.

(Tr. 21)

It is well established that an ALJ may properly consider the credibility of a claimant in conjunction with her consideration of the medical and other evidence described above, and that this credibility finding is due great weight and deference in light of the ALJ's opportunity to observe the claimant's demeanor while testifying.  Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 476 (6th Cir. 2003).  In considering the ALJ's finding on the weight of plaintiff's subjective complaints, this court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [plaintiff] are reasonable and supported by substantial evidence in the record."  Id.

The undersigned must conclude that the reasons given by the ALJ for partially discounting the credibility of plaintiff's subjective complaints are not reasonable.  Her explanation boils down to this:  plaintiff's subjective complaints are not verified or verifiable by the objective medical record.  Despite the apparent lack of evidence controverting plaintiff's report of a minimal level of daily activity, this purely subjective report was discounted because it could not be objectively confirmed -- a truism which, as employed here, effectively eliminates the distinction between "medical" and "other" evidence drawn in the regulations.  While inconsistency between a claimant's subjective testimony and the objective medical record is properly, and often heavily, weighed against the credibility of that claimant, it may not be the sole reason for discrediting the claimant.  See 20 C.F.R. § 416.929(c)(2)-(3) ("[W]e will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work ... solely because the available objective medical evidence does not substantiate your

29

statements. . . . Since symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms" such as, e.g., reports of daily activities). While the ALJ gave heavy consideration to the fact that the treatment of plaintiff's symptoms was limited to the prescription of medication and was thus conservative, she does not appear to have given any particular consideration to the types, dosages, or effectiveness of these medications, nor to the context of the symptomatic treatment ordered for plaintiff's left foot and ankle maladies, i.e., following two surgical procedures to that foot and ankle, and related complications due to nerve trauma and recurrent wound infection. The record shows that multiple medical sources prescribed significant doses of narcotic pain medication. The record is also consistent with the notion that these medications were less than effective in controlling plaintiff's lower extremity symptoms.

Finally, while plaintiff's prior work history is certainly sparse, the inference from such a record that plaintiff's medical problems are perhaps not the primary factor prohibiting her current employment would seem to have less force in this case, where plaintiff's alleged onset date of disability is in 1988, and the years of lean earnings prior to that date were thus in the relatively remote past, occurring when plaintiff was between the ages of 14 and 25 and simply not earning much of an hourly wage. See Tr. 82, 143-44.

In conclusion, the undersigned finds error in the ALJ's rejection of the consensus medical opinion of plaintiff's limitations with respect to prolonged standing and walking, and in her rationale for finding plaintiff's subjective complaints less than fully credible.

## IV.  Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be GRANTED, and that the decision of the SSA be REVERSED and the cause REMANDED for further administrative proceedings consistent with this report.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court.  Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 11th day of January, 2012.

 s/ John S. Bryant
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE